## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

PATRICIA ANN WEAVER,

      Plaintiff,

v.                                                          Case No:  2:12-cv-549-FtM-29CM

CAROLYN  W. COLVIN,
COMMISSIONER OF SOCIAL
SECURITY,[1]

      Defendant.

_____

## REPORT AND RECOMMENDATION[2]

      This cause is before the Court on Plaintiff Patricia Ann Weaver's ("Plaintiff")

appeal of the final decision of the Commissioner of the Social Security Administration

("SSA") denying her claim for disability and Disability Insurance Benefits ("DIB").

For the reasons discussed herein, the Court recommends that the decision of the

Commissioner be **AFFIRMED** pursuant to 42 U.S.C. § 405(g).

### I.    Issues on Appeal and Procedural History

      This appeal presents a single issue:  whether the Administrative Law Judge's

decision that Plaintiff can perform light work and all of her past relevant work

---

1   Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Commissioner Michael J. Astrue as the Defendant in this suit. Fed. R. Civ. P. 25(d).  No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2   Failure to file written objections to the proposed findings and recommendations contained in this report within **fourteen (14)** days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

("PRW") is supported by substantial evidence.  Specifically, Plaintiff contends that the ALJ erroneously accorded "significant weight" to the residual functional capacity ("RFC") opinions of non-examining state agency medical reviewers, neither of which mentioned Plaintiff's right knee osteoarthritis or hernia, as the surgeries giving rise to those conditions post-dated the RFC opinions.  Doc. 16 at 15.

On October 3, 2008, Plaintiff filed an application for DIB, asserting a disability onset date of August 5, 2008.  Tr. 103-09.  The SSA denied Plaintiff's claims, both initially on January 21, 2009 and upon reconsideration on April 17, 2009.  Tr. 61-64, 69-73.  Plaintiff requested and received a hearing before Administrative Law Judge Thomas J. Gaye ("ALJ") on January 13, 2011.  Tr. 16.  Following the hearing, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled and denying her claim for benefits.  Tr. 13-23.  Plaintiff then requested review by the Appeals Council, which was denied on August 3, 2012.  Tr. 6-9.  Plaintiff timely filed her Complaint in this Court, pursuant to 42 U.S.C. § 405(g), on October 4, 2012 (Doc. 1). The matter has been fully briefed and is now ripe for review.

## II.    Summary of the ALJ's Decision

The ALJ first determined that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2011.  Tr. 18.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 5, 2008, the alleged onset date ("AOD").  *Id.*

At step two, the ALJ found that Plaintiff had "the following severe impairments:  blind right eye, status post clip of ophthalmic artery aneurysm, and

hypertension," and noted the "combination of impairments causes significant limitation in the claimant's ability to perform basic work activities." *Id.* The ALJ also found that Plaintiff's medically determinable impairment of major depressive disorder did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities, and was therefore nonsevere. *Id.*

In making that determination, the ALJ expressly considered the four broad functional areas set forth in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 C.F.R., Part 404, Subpart P, Appendix 1), also known as the "paragraph B" criteria.

In the first functional area – activities of daily living – the ALJ found that Plaintiff had no limitation, and noted that Plaintiff previously reported she plays golf, watches television and does housework. Tr. 19. In the second functional area – social functioning – the ALJ found that Plaintiff had mild limitation, because although Plaintiff reported that she had friends in school and is sociable, she also reported that she presently had no social life. *Id.* In the third functional area – concentration, persistence or pace – the ALJ determined that the record did not support more than mild limitation. *Id.*

Finally, in the fourth functional area – episodes of decompensation – the ALJ noted that Plaintiff had not experienced any episodes of decompensation of extended duration, and therefore there was no indication of limitation in that area. *Id.* Thus, the ALJ determined that, because Plaintiff's medically determinable mental impairment caused no more than "mild" limitation in any of the first three functional

areas and "no" episodes of decompensation of extended duration in the fourth functional area, it was nonsevere.  *Id.*  *See* 20 C.F.R. § 404.1567(c).

Notwithstanding the above-noted impairments, at step three the ALJ determined that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  *Id.*  The ALJ then found, as part of step four, that Plaintiff had the residual functional capacity ("RFC") "to perform light work as defined in 20 C.F.R. 404.1567(b) except only limited depth perception and field of vision in right eye."  Tr. 20.  Though the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, he determined that her statements as to the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment.  Tr. 20.

The ALJ described Plaintiff's testimony regarding the disabling effects of her conditions, noting that she has a lack of depth perception; said that her right eye is essentially useless, sensitive to light, and becomes painful if over-exposed, which results in strain on her left eye; and "that some of her other jobs were affected by the ailments of vision loss, brain artery defect, blurred vision, and depressive episodes." *Id.* Specifically, the ALJ explained that Plaintiff's credibility was undermined in light of other evidence and testimony, such as that she drove herself to examinations and arrived on time, despite stating that she is blind and should not drive, and her admissions that she plays golf, watches television, and does some housework,

including cleaning and microwave cooking, as well as shops for groceries and cares for her dogs.  *Id.* at 21.  The ALJ posited "[t]he claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations."  *Id.*

Accordingly, the ALJ found that Plaintiff was capable of performing her past relevant work as a cashier I, cashier/checker, retail supervisor, claims supervisor, and general insurance management, as that work did not require the performance of work-related activities precluded by Plaintiff's RFC, and Plaintiff was therefore not disabled.  Tr. 21, 23.

### III.   Social Security Act Eligibility and Standard of Review

To be entitled to benefits, a claimant must be disabled.  A "disability" reflects the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. §§ 404.1505.  A "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques, and the impairment must be severe, making the claimant unable to do her previous work or any other substantial gainful activity which exists in the national economy.  42 U.S.C. §§ 423(d)(2) and (3); 20 C.F.R. §§ 404.1508-404.1509.

The SSA promulgated regulations detailing a sequential evaluation process to be used in determining whether a claimant is disabled.  20 C.F.R. § 404.1520.  The evaluation process requires the ALJ to determine, in sequence, whether the claimant is currently engaged in substantial gainful activity; whether the claimant has a severe impairment; whether the severe impairment meets or equals the medical criteria set forth in 20 C.F.R. Pt. 404, Subpart P, Appendix 1; and whether the claimant can perform her past relevant work.  If the ALJ determines the claimant cannot perform her prior work, the final step of the evaluation process requires the ALJ to determine if the claimant can perform any other work in the national economy in light of her age, education, and work experience.  20 C.F.R. § 404.1520(a).  The claimant bears the burden of persuasion through step four and at step five the burden shifts to the Commissioner.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).  A claimant is entitled to benefits only if the ALJ determines she is unable to perform her past work or any other work.  *Id.* at 141-42.

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence.  *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988).  A determination by the Commissioner that a claimant is not disabled must be upheld if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla; i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d

1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision, *Foote,* 67 F.3d at 1560, and must affirm the decision of the Commissioner if the decision is supported by substantial evidence even if the reviewer would have reached a contrary result or finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). Credibility determinations fall within the province of the ALJ, *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005), and a reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record, nor will it reweigh the evidence. *Foote,* 67 F.3d at 1560, 1562.

## IV.   Relevant Evidence

### a. Plaintiff's Testimony and Reports

Plaintiff, who was born on December 12, 1946, claims disability beginning August 5, 2008. Tr. 110. She graduated from Franklin University in Columbus, Ohio with a degree in Business Administration and acquired a professional insurance designation as a Charter Property Casualty Underwriter. Tr. 38-39. Plaintiff's past relevant work experience includes positions as an insurance claims manager, retail supervisor, and cashier. Tr. 179. She alleges disability due to aneurysm of the optic artery, blindness in her right eye, hypertension, allergies, depression and anxiety. Tr. at 64.

Plaintiff testified that she stopped working after her brain aneurysm surgery on August 6, 2008, which resulted in the loss of vision in her right eye.  Tr. 39, 42. Although she claims the loss of her vision and a resulting lack of depth perception have affected her ability to work as well as perform various other daily activities, she testified that she remains able to perform some household chores, such as cooking, cleaning, and laundry.  Tr. 43-48.  Moreover, Plaintiff testified that she has to be careful because of a hernia, which she claims restricts her lifting capacity to no more than ten pounds.  Tr. 50.

In support of her initial claim for disability benefits, on October 3, 2008, Plaintiff completed a Disability Report – Adult which requires the claimant to describe her illnesses, injuries or conditions and their effects upon the claimant.  Tr. 122, 125.  Plaintiff identified that she had an "[a]neurism on rt optic artery, blind in rt eye, hypertension, anxiety, depression, high cholesterol, extreme allergies which caused anafalactic [sic] shock in 2008."  Tr. 126.  On November 9, 2008, Plaintiff completed a Supplemental Pain Questionnaire, describing in further detail that temperature extremes and bright lights sometimes cause pain in the area of her surgery and her right eye.  Tr. 144.  That same day, Plaintiff also completed a Function Report – Adult, in which she described her daily activities as dressing, eating, talking to friends, watching TV, walking and feeding her dogs, preparing sandwiches and snacks and doing some laundry and cleaning.  Tr. 171-75.  Plaintiff noted that the loss of vision in her right eye made it more difficult for her to golf and

fish, and that, although she can drive a car, she can do so only for short distances and not at night.  Tr. 174.

As part of her appeal of the initial denial of her claim, Plaintiff completed an updated Disability Report on March 10, 2009, in which she identified that since she last completed a disability report, she became depressed, and an MRI revealed that her internal carotid artery appeared to be occluded distal to the bulb, which occurred on October 2, 2008 and November 10, 2008, respectively.  Tr. 191, 193.  She also completed a second Function Report – Adult on March 17, 2009, in which she identified her daily activities as "normal activities;" specifically, walking, feeding and cleaning up after her dogs, occasionally preparing her own meals, some laundry and cleaning, and noted that she is able to drive short distances, pay bills, count change, and handle a savings account.  Tr. 199-202.  Plaintiff also stated that she could no longer read books or the daily newspaper, golfing had become difficult, and that she was no longer able to work in the yard.  Tr. 203.  As to her abilities, Plaintiff described that she is able to lift 15 pounds or less, but cannot walk great distances or pay attention for more than a few minutes, and sometimes has difficulty following spoken or written instructions.  Tr. 204.

Plaintiff completed another disability report to update the status of her condition, noting that since her last disability report she developed osteopenia, which lessened her ability to work and affected her daily activities; discovered colon polyps that required surgery; and had resection surgery on July 13, 2009.  Tr. 226-27.

### b.  Third Party Non-medical Evidence

Plaintiff also supplied third party function reports in support of her claim for DIB.  Plaintiff's longtime friend Mary Anderson submitted one such report, in which she identifies that Plaintiff is able to feed and walk her dogs, though she does have some difficulty walking them at night;  has no problems with personal care and does not need to be reminded to take care of her personal needs and grooming, though she occasionally needs reminders to take her medicine;  prepares her own light but complete meals;  is able to fish and golfs once per week;  and regularly communicates with Ms. Anderson via telephone and e-mail.   Tr. 154-61.   Ms. Anderson also identified that Plaintiff can pay bills, count change, and handle a savings account, but that she has difficulty balancing a checkbook and following spoken or written instructions.  Tr. 156, 159.

The second third party function report was submitted by Mary Fontane, Plaintiff's roommate.   In that report, Ms. Fontane states that Plaintiff walks and feeds her dogs;  prepares her own meals, such as breakfast and sandwiches;  cleans and does some laundry;  dines with others, golfs, and attends church weekly;  does not need to be reminded as to her personal care but occasionally does need to be reminded to take her medicine;  and can pay bills, count change, and handle a savings account, but has trouble balancing a checkbook.   Tr. 164-67.   Ms. Fontane also notes that Plaintiff can follow simple written instructions "fairly well," but spoken instructions often have to be repeated.  Tr. 168.

### c. Medical Evidence

Plaintiff submitted a multitude of medical records in support of her claim. A brief recitation of that evidence follows.

On June 3, 2008, Dr. Eileen J. Schwartz saw Plaintiff for a neurological consultation following Plaintiff's allergic reaction to fire ant bites. Tr. 291-92. As to Plaintiff's past medical history, Dr. Schwartz noted that Plaintiff was previously informed she needed a total right knee replacement. Tr. 292. Dr. Schwartz's review of Plaintiff's musculoskeletal system revealed that Plaintiff did not have muscle pain, joint pain, inflammation, or restriction of motion. Tr. 292. Dr. Schwartz also determined that Plaintiff did not have any neurologic restrictions or limitations. Tr. 293.

Plaintiff also submitted medical records related to follow-up treatment by Dr. Joseph R. Salaz on June 18, 2008, in which Dr. Salaz noted that Plaintiff was unable to walk heel-to-toe without difficulty and had some limitation of range of motion in the lower lumbar area. Tr. 236. On August 5, 2008, Dr. Raymond D. Santucci saw Plaintiff for a postoperative consultation immediately following her neurosurgery and again on August 7, 2008, and noted there were no complications from the procedure. Tr. 246, 248. Plaintiff's discharge summary reveals that by August 9, 2008, she stated that she was "completely blind in the right eye," but by August 12, 2008, when Plaintiff was discharged, "her vision had actually improved" and she "was able to see the fingers when held up in front of her right eye." Tr. 266.

Dr. Eric Eskioglu assessed Plaintiff during a September 23, 2009 follow-up visit, noting that "[u]pon rising in the morning [Plaintiff] is completely blind in the right eye" and "[t]he blindness will be permanent." Tr. 302. He also identified that Plaintiff "has started to drive and resume some of her normal activities" and "is filing for disability, which I support." *Id.*

Plaintiff saw Dr. Marlene Moulton on October 9, 2008 to follow-up for her depression and hypertension. Tr. 415. Dr. Moulton noted that Plaintiff was doing "very well" and felt "like her old self again." *Id.* Plaintiff denied "chest pain, dizziness, headaches, and palpitations," and "any symptoms of neurological impairment." *Id.* Dr. Moulton ultimately diagnosed Plaintiff with anxiety and hypertension. Tr. 417-18. On December 22, 2008, Plaintiff saw Dr. Moulton for another follow-up for her anxiety, prompting Dr. Moulton to note that Plaintiff still had "residual trauma from the events surrounding the surgery," and was then "unable to see from the right eye and is not able to work and carry out her activities of daily living." Tr. 474.

Plaintiff again saw Dr. Moulton for a follow-up for anxiety and depression on February 12, 2009. Tr. 468. Dr. Moulton noted Plaintiff complained of, palpitations, panic attacks, sleep disturbance and feeling anxious, and that Plaintiff had filed for disability but her claim was denied. *Id.* In a letter dated February 24, 2009, Dr. Moulton expressed support for Plaintiff's disability claim, opining that Plaintiff "has suffered significant limitations in her activity of daily living and her ability to work,"

and "has psychological trauma from the events surrounding her loss of vision." Tr. 221.

Dr. Cesar A. Santiago performed an open right hemicolectomy on Plaintiff on July 13, 2009, and post-operatively diagnosed Plaintiff with a mid-ascending colon polyp. Tr. 505, 576. After the surgery, Plaintiff continued with regular follow-up visits to Dr. Moulton. On August 5, 2009, during a follow-up for her hypertension, Dr. Moulton noted that Plaintiff was recently diagnosed with colon cancer and had a hemicolectomy, which caused some scarring, but that Plaintiff was otherwise "doing well." Tr. 510. Dr. Moulton also noted that Plaintiff was "negative for behavioral problems, sleep disturbance, and decreased concentration," and was "not nervous/anxious." *Id.*

On July 14, 2010, Dr. Moulton saw Plaintiff for a new onset hernia located in the area of Plaintiff's abdominal surgery. Tr. 559-60. Dr. Moulton noted Plaintiff had "some mild discomfort" around the site of the hernia, "but no pain." Tr. 559. On September 15, 2010, Dr. Moulton identified that Plaintiff had "osteoarthritis of the knee" which was to be replaced at Gulf Coast Hospital. Tr. 564. Dr. Moulton also wrote that Plaintiff had "no chest pain, is very active and has hypertension and dyslipidemia that is very well controlled." *Id.* On September 27, 2010, Plaintiff underwent a right total knee arthroplasty resulting from degenerative disc disease. Tr. 570-72. A post-operative x-ray of Plaintiff's right knee showed "satisfactory alignment without radiographic evidence of complications." Tr. 584.

### d. Psychological Evidence

On January 13, 2009, Plaintiff visited Dr. Bernard, a board certified clinical psychologist. Tr. 436. Plaintiff's chief complaint was that the loss of vision in her right eye affected her entire life because she could no longer read, should not drive, "can't see to putt [in golf]," and had to sell her boat and quit her job. *Id.* Plaintiff revealed, however, that she is able to "play golf, as much as I can, watch TV, [and] do housework" though she also stated that she was depressed and had thoughts of suicide. *Id.* Dr. Bernard found Plaintiff's thought process to be rational, clear, and logical, noted Plaintiff was well oriented for time and place and had no indications of cognitive dysfunction. Tr. 437.

On April 10, 2009, Dr. Moulton completed a Supplemental Mental Impairment Questionnaire, which identified that Plaintiff suffered from a mental impairment that significantly interferes with her daily activities. Tr. 481.

### e. State Agency Examinations

Plaintiff was evaluated by Dr. Arthur Hamlin, Psy.D., on January 20, 2009 for completion of the Psychiatric Review Technique. Tr. 438-51. After noting that Plaintiff had non-severe impairments categorized as "affective disorders," Dr. Hamlin further noted Plaintiff had a "medically determinable impairment" that did not satisfy other criteria, identified as "MDD." Tr. 441. Dr. Hamlin then considered the "paragraph B criteria," finding that Plaintiff had no restriction of activities of daily living; mild difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation

of extended duration.  Tr. 448.  He also noted that "[e]vidence does not establish the presence of the "C" criteria."  Tr. 449.  Upon considering the entirety of the evaluation, Dr. Hamlin noted that Plaintiff's "B criteria evidence does not show moderate limitations.  Claim is adjudicated as a non-severe impairment."  Tr. 450.

The same day, a Physical Residual Functional Capacity Assessment was completed by Single Decisionmaker ("SDM")[3] Kelly Nicola.  Tr. 452-59.  Plaintiff's stated primary diagnosis for purposes of that assessment was "R eye blindness" and her secondary diagnosis was "HTN [hypertension]."  Tr. 452.  As to Plaintiff's exertional limitations, the SDM determined that Plaintiff could occasionally lift or carry up to 20 pounds; frequently lift or carry up to 10 pounds; stand and/or walk with normal breaks for about 6 hours in an 8 hour work day; could sit with normal breaks for about 6 hours in an 8 hour workday; and was not limited in her ability to push or pull, except by her ability to lift and carry.  Tr. 453.  The assessment also led the SDM to conclude that Plaintiff had no postural limitations, manipulative limitations, communicative limitations or environmental limitations, but that Plaintiff did have visual limitations of limited depth perception and limited field of vision.  Tr. 455-56.

---

3  "SDMs are part of a test program of the Social Security Administration for making initial disability determinations by non-medical experts[,]"  *Chaverst v. Astrue*, No. 2:11-CV-2785-RDP, 2012 WL 5379063, *8 (N.D. Ala. Oct. 31, 2012) (citing 20 C.F.R. § 404.906(a)), and "are thus permitted under the law."  *Houston v. Colvin*, No. 7:13-cv-00208-JEO, 2014 WL 587986, *5 (N.D. Ala. Feb. 14, 2014) (slip op.).  *See also* 71 Fed. Reg. 45890-01 (describing the extension of disability determination procedures, including "the use of a single decisionmaker who may make the initial disability determination in most cases without requiring the signature of a medical consultant").

Finally, the SDM determined that Plaintiff's symptoms were attributable to a medically determinable impairment; the severity or duration of Plaintiff's symptoms were proportionate to the expected severity or duration of the medically determinable impairment; and that the severity of Plaintiff's symptoms were consistent with the evidence regarding activities of daily living and alterations of usual behavior or habits. Tr. 457. The SDM also noted that Plaintiff "should be capable of performing work related activities within the parameters of this RFC." *Id.*

Plaintiff underwent another Physical Residual Functional Capacity Assessment on April 13, 2009, which was performed by Albert Ponterio M.D. Tr. 482-89. Plaintiff's primary diagnosis at the time of that exam was identified as "blind OD" and her secondary diagnosis was "s/p clip of ophthalmic artery aneurysm." Tr. 482. Dr. Ponterio found Plaintiff's exertional limitations to be that Plaintiff could occasionally lift up to 20 pounds; could frequently lift up to 10 pounds; could stand or walk with normal breaks for about 6 hours in an 8 hour workday; could sit with normal breaks for about 6 hours in an 8 hour workday; and was not limited in her ability to push or pull, except by her ability to lift and/or carry. Tr. 483.

Dr. Ponterio also determined Plaintiff had no postural limitations, manipulative limitations, or communicative limitations, but that Plaintiff's environmental limitation necessitated she avoid concentrated exposure to hazards such as machinery and heights, and that Plaintiff also had the following visual limitations: near and far acuity, depth perception, accommodation, color vision and

field of vision.  Tr. 484-86.  Dr. Ponterio noted that while he believed Plaintiff's allegations were credible, she was also capable of performing the RFC.  Tr. 487.

Finally, Dr. Ponterio highlighted that there were medical source statements about Plaintiff's limitations or restrictions in her file that were significantly different from his findings; specifically, Dr. Ponterio wrote: "IF MSO OF DR. MOULTON 2/24/09 IMPLIES[ ]CLMT TI T& PD DUE TO HER CONDITION, THIS IS NOT SUPPORTED BY MER IN FILE, AND CLMT CAN PERFORM WITHIN PARAMETERS OF THIS RFC."  Tr. 488.

Plaintiff also presented before Carol Deatrick, Ph.D., for another Psychiatric Review Technique on April 15, 2009.  Tr. 490-503.  Dr. Deatrick determined that Plaintiff's affective disorders were not a severe impairment.  Tr. 490.  Again, Plaintiff was determined to have a medically determinable impairment that did not precisely satisfy the criteria for affective disorders, identified as "MDD."  Tr. 493.  Dr. Deatrick evaluated the "paragraph B criteria" and found Plaintiff to have no restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration, and also noted that evidence did not support the presence of "C criteria."  Tr. 500-01.

Dr. Deatrick also made the following "consultant's notes":

> THE CL ALLEGES WORSENING OF CONDITION BUT THIS IS DATED BEFORE THE PREVIOUS DENIAL.  THE CL. HAS NO NEW SOURCES AT RECON.  HX OF RX OF XANAX BUT MER FROM T. S. INDICATED CL. DOING WELL.  MMSE SCORE OF 29/30 WOULD RULE OUT SIGNIF. CONGNITIVE ISSUES.  CL. IS ABLE TO MANAGE FUNDS AND PERFORM SELF CARE.  CL. COMPLAINS OF SHORT TEMPER BUT MER

DOES NOT SUPPORT ANTISOCIAL OR CRIMINAL BEHAVIOR.  OVERALL, THE OBJECTIVE MER DOES NOT SUPPORT SIGNIF. LIMITS DUE TO MENTAL ISSUES.

Tr. 502.

## V.   Analysis

Plaintiff's argument on appeal is that the Commissioner failed to base the determination that Plaintiff can perform light work and all of her past relevant work upon substantial evidence.  Specifically, Plaintiff contends that the ALJ accorded "significant weight" to the Physical RFC opinions of the state agency medical examiners, neither of which "mentioned the claimant's right knee osteoarthritis . . . [or] the claimant's hernia that resulted from her colon surgery," because both claimant's knee replacement surgery and colon surgery post-dated the RFC opinions. Doc. 16 at 15.

The weight afforded a nontreating medical source's opinion on the issues of the nature and severity of a claimant's impairments depends upon the source's examining and treating relationship with the claimant, the length of the treatment relationship, the evidence the medical source presents to support his opinion, how consistent the opinion is with the record as a whole, the specialty of the medical source and other factors.  *See* 20 C.F.R. § 404.1527(c).  Medical source opinions may be discounted when the opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if the opinion is inconsistent with the record as a whole.  SSR 96-2p; *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159-60 (11th Cir. 2004).

Although the ALJ identified that he had accorded "significant weight" to the State psychiatric and medical consultants because they were "based on a thorough review of the evidence and familiarity with Social Security Rules and Regulations and legal standards set forth therein" (Tr. 22), that evidence was not the sole basis of the ALJ's assessment, as Plaintiff concedes in her brief. *See* doc. 16 at 16 ("Although, in the instant case, the ALJ did not rely *solely* on the non-examining state agency physicians' two RFC opinions, he nonetheless accorded such opinions '*significant weight*' in the overall disability determination . . . ."). Rather, the ALJ's assessment was based upon "objective medical evidence, the State agency consultants, and to some extent the claimant's own testimony." *Id.* The ALJ noted that the opinions of the state medical consultants were "well supported by the medical evidence," including the Plaintiff's medical history, clinical and objective signs and findings and detailed treatment notes. *Id.*

State agency medical examiner Dr. Ponterio assessed Plaintiff as able to perform light work, even after acknowledging her visual limitations and right eye blindness. Tr. 22, 482-89. That determination is consistent with information reported by Plaintiff, such as that she can lift up to 15 pounds and walk short distances, in addition to information submitted by third parties, including that Plaintiff walks and cares for her dogs, does some light household chores and cleaning, and does her own shopping, either by driving herself or riding in a car. Tr. 204, 209-11.

While the performance of everyday tasks cannot be used to make a determination that Plaintiff was not disabled, Plaintiff's participation in such activities supports the ALJ's determination that she is capable of light work. *See, e.g.*, *Graham v. Apfel*, 129 F.3d 1420, 421-22 (11th Cir. 1997) (finding that activities such as performing light housework and grocery shopping supported ALJ's determination that the plaintiff could perform light work); *Moore*, 405 F.3d at 1212 (noting that the ALJ properly discredited a treating physician's testimony by pointing out the contrasts in the claimants daily activities and the physician's diagnosis); *Wilson v. Barnhart*, 284 F.3d 1219, 1226 (11th Cir. 2002) (upholding the ALJ's finding that the claimant's allegations of disabling pain were not credible because her daily activities demonstrated otherwise); *Norris v. Heckler*, 760 F.2d 1154, 1158 (11th Cir. 1985) (holding that an ALJ may consider the plaintiff's demeanor when making a credibility determination).

In addition to the state agency medical exams, the ALJ also considered evidence from Plaintiff's treating physicians and noted that, "[i]n accordance with 20 C.F.R. 404.1527, the opinions of the claimant's treating sources are given *more* weight because they had the opportunity to treat the claimant." *Id.* (emphasis added).  As to Plaintiff's osteoarthritis, the ALJ noted Plaintiff's September 17, 2010 diagnosis of osteoarthritis of the knee and that she underwent knee replacement surgery on September 27, 2010.  Tr. 21.  The record reveals that Plaintiff's osteoarthritis was diagnosed by Dr. Moulton, who cleared Plaintiff for knee surgery and described her as "very active."   Tr. 564.   The ALJ also referenced in his decision Plaintiff's

September 27, 2010 total knee arthroplasty and questioned Plaintiff about her knee replacement during the administrative hearing, identifying it as the "biggest thing." Tr. 41, 43-44. Medical records provided by Plaintiff in support of her claim showed satisfactory alignment of Plaintiff's knee after the surgery and no complications, and the ALJ noted that there are no medical records in evidence illustrating any subsequent complications arising from Plaintiff's right knee replacement surgery. Tr. 568-69.

While it is true that the ALJ does not specifically cite to Plaintiff's colon surgery or abdominal hernia in his decision, the ALJ was not required to discuss every piece of evidence submitted by Plaintiff in support of her claims. *Cooper v. Comm'r of Soc. Sec.*, 521 Fed. Appx. 803, 808-09 (11th Cir. 2013) ("An ALJ is not required to refer specifically to each piece of evidence in the record, but must sufficiently explain the weight given to obviously probative exhibits." (quotation marks omitted)). More importantly, there is no medical evidence of record indicating that Plaintiff had any functional limitations as a result of the surgery or hernia.

Even if the ALJ accorded "significant weight" to the RFC opinions rendered prior to Plaintiff's hernia and knee surgery, the ALJ had access to the entire record, including Plaintiff's testimony about the effects of the hernia, and specifically stated that he considered the entire record in determining that Plaintiff has the residual functional capacity to perform light work. Tr. 20. *See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) (explaining that the ALJ was not required to develop the medical record for the time period following the filing of Plaintiff's claim for disability,

and therefore she was not entitled to relief on her claim that the ALJ failed to fully develop the record and consider evidence from the period subsequent to her filing); *see also Cooper*, 521 Fed. Appx. at 807 ("Moreover, even if the non-examining doctor was unable to review all of Cooper's medical records before making her RFC determination, she cited several portions of the record in support of her conclusions, and the ALJ, who made the ultimate determination, had access to the entire record as well as Cooper's testimony."). Though the ALJ does have a duty to develop a full and fair record, Plaintiff still bears the ultimate burden of proving that she is disabled by producing evidence in support of her claim. *Ellison*, 355 F.3d at 1276.

In rendering his decision, the ALJ considered all evidence of record and properly determined that Plaintiff retained the ability to perform her past relevant work, and is therefore not disabled or entitled to disability benefits. In doing so, the ALJ applied the correct legal standard, and the overall record in this case reveals that substantial evidence supports his decision.

## VI.   Conclusion

Accordingly, for the reasons stated in this Report and Recommendation, it is hereby respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

**DONE** and **ENTERED** in Fort Myers, Florida on this 17th day of March, 2014.

CAROL MIRANDO
United States Magistrate Judge

Copies to:

The Honorable John E. Steele
Counsel of record